J. F. MILLER AND J. T. HOGGARD v. CORNELL-YOUNG COMPANY.

(Filed 9 April, 1924.)

**Principal and Agent—Evidence—Declarations of Agent—Accident—Hospital Expenses.**

Evidence that one in charge of a construction company's camp, with authority to employ and discharge workmen, to supply them with provisions, etc., at the company's expense, and generally to look after their welfare, is sufficient *aliunde* to admit in evidence his declarations of

agency and to bind his principal upon an emergency to pay for his surgical and other expenses, at a hospital, of one of the employees who had met with a serious or fatal accident, in the course of his employment, irrespective of the negligence of his employer, upon his representation to the hospital authorities that his principal would pay them.

APPEAL by defendant from *Cranmer, J.,* at December Term, 1923, of NEW HANOVER.

This was a civil action. The facts material for a decision of the case are: The plaintiffs are physicians and surgeons and were engaged in the practice of medicine and surgery in the city of Wilmington, and, in connection with their practice, maintained a hospital, known as St. John's Sanatorium, in which hospital patients are received for treatment. The defendant is a corporation, organized and created under the laws of Georgia. That the defendant was engaged in certain construction work, building bridges in Pender County, N. C., and on 25 July, 1922, one of defendant's employees, Scott, was seriously and painfully injured while working for defendant company. He had a fracture of the spine, had a broken back, third and fourth lumbar vertebræ crushed, both legs were paralyzed. He was brought to plaintiffs' hospital for medical treatment, in an automobile, on a cot, by two men, Jones and Devane. Scott was helpless. One Hogan was superintendent of the defendant company in building the bridges. Jones was working for defendant company; he kept the time and paid off the hands. T. J. Henry, who had a grocery and hardware store in the country, near where the defendant company was doing the construction work, sold the defendant company a good deal of goods, covering a period of six or eight months. The goods were delivered to Mr. Hogan, the superintendent, and consisted of nails, rubber, roofing, axes, axe handles, and anything used pertaining to the work. Mr. Hogan looked after the work; he had sole charge of the operations of the work. He hired and discharged employees. The orders for these goods were given by either Mr. Hogan or Mr. Jones, and were paid for by defendant, by check from defendant's Macon (Georgia) office.

T. J. Henry testified, in part: "The goods we furnished to Mr. Hogan were furnished after Mr. Young, of the Cornell-Young Company, had made arrangements and authorized us to furnish them. The nearest I can recall it—I do not know whether it was the first or second time I ever saw Mr. Young—he came out and told me and my father—we were doing business together—that he had gotten the contract to build our bridges, and that he had brought Mr. Hogan along—the man who was going to do the work—and whatever Mr. Hogan needed to let him have, and to send the bill in, and they would foot it, and I gladly did it. It

was on the faith of that authority that I furnished the goods. Mr. Jones told me to send the bills in monthly, and I always did, and I always got my money. I was paid by check from the Macon office. I knew Mr. Young as being the head of the Cornell-Young Company. He came out and said he got the contract to build these bridges. That's all the acquaintance I had with Mr. Young. He stated, in substance, that Mr. Hogan was in charge of the operations of the Cornell-Young Company at that point."

J. F. Miller, one of plaintiffs, testified, in part: "Mr. Hogan came to the hospital while Scott was there, but I do not recall how soon after Scott was brought there that Mr. Hogan came—I think it was a few days. In the presence of Dr. Hoggard and myself, he made the statement that he wanted us to give him every care, everything that was needed, and if we needed any one else to call him in, and put on special nurses and do everything that was possible. It was necessary to perform a serious operation on Scott, and Hogan was notified, and requested us to get some one else to operate on Scott if it was needed. Mr. Scott was a patient of Dr. Hoggard, and was placed in the sanatorium I was in charge of. He had a broken back, pressure on the spinal cord, and was paralyzed from that point down. Mr. Hogan had been to the hospital more than once, and said he wanted Scott to have every care we could give him—special nurses, and everything we could do to make him comfortable and relieve his condition."

Hogan was at the hospital several times.

Dr. J. F. Hoggard testified, in part: "I had known Mr. Hogan before. Mr. Hogan did not come down with Scott. He later told me that the Cornell-Young Company was standing back of them and would pay every cent of it—to get the best attention for him. I stood responsible for all the bills, personally. Scott remained in the hospital until his death. A couple of days after he was admitted, Mr. Hogan came down and had a conversation with me. I do not know that he stated how Scott was hurt. He came several times, but I did not see him, except when he asked for me. He told me that Cornell-Young Company was back of it; that he was in their employ, and they wanted the best attention for him; that they treated their men that way. I spoke to him about the operation and told him that we had two surgeons here—Dr. Green and Dr. Hart—who could—he left it to me. I was the medical doctor in charge. . . . We operated on him as soon as we could. Mr. Hogan told me to notify the Cornell-Young Company, which I did."

Dr. G. C. Beard testified, in part: "I was called to attend an employee of the Cornell-Young Company by the name of Scott. I found him over on the highway, near Mr. George Devane's, where the Cornell-Young Company was carrying on construction work. Several of the

employees were with him and had moved him from the bridge up to the tent. I talked to several of the fellows that were attending him. I saw Mr. Hogan there; he was around and about, trying to relieve this young man in any way he could."

Q. "Did you receive any directions from anybody about attending Scott and what to do for him?" A. "I did."

Q. "From whom?" A. "From Mr. Hogan."

Q. "Now, what did he tell you?" A. "He told me, if this patient needed hospital attention, to send him in. I found Scott in a condition of shock. I made a physical examination, and the patient showed injury from the spine, with probable internal injuries. I treated Scott, and went back to see him that afternoon late. I saw him two or three times. On my second visit I saw Mr. Hogan. These people were strangers to me. I had not been on this practice long, and I had never been called there before; so I didn't stop to inquire any of their names. On my final trip there to see Scott I thought it was necessary for the patient to go to the hospital. I was talking to Hogan. I do not recall exactly what he said, but everybody agreed, both he and I, that that was the course to take with the case, and then we went over the preliminaries as to how to get him to the hospital. I had a discussion with Mr. Hogan about how to get him to the hospital. I instructed Mr. Hogan as to the details of putting the patient on a cot, getting him on a truck and taking him over to the train, or, if it was too late for the train, to bring him on in on the truck. I do not know who accompanied Scott to the train, but I do know that he was sent to the hospital. I do not know who was present at the time. I was at the hospital and went in to see Dr. Hoggard or Dr. Miller, and one of them went in with me. I communicated with Dr. Hoggard or Dr. Miller about sending Scott to Wilmington, and I wired the hospital to meet the patient. . . . . I rendered a bill to the Cornell-Young Company for services, which was paid."

Dr. E. R. Hart (admitted to be an expert surgeon), testified, in part: "I recall Scott, who was injured while employed by the Cornell-Young Company in 1922. I saw him, at the request of Dr. Miller and Dr. Hoggard, and examined him some time after he had been committed to the hospital, though I do not recall just what date he was admitted. It was a few days, possibly two or three, before I saw him. I sent for Mr. Hogan, who came to see me. I explained to him Scott's condition. I told him it would be necessary for an operation—that he had a fracture of the spine. He wanted to know the condition of Mr. Scott, as well as I remember, and I said it was a fracture of the spine, which caused paralysis of the lower part of his body, and an operation would be necessary to attempt to remove what pressure there was on the nerves.

I was instructed to go ahead and do all that was necessary for Mr. Scott. The conversation took place in my office."

Several weeks after the operation the young man died—on 18 September, 1922.

There was further testimony as to the expenses in the hospital, special nurses, operation, medical attention, etc.

The defendant excepted and assigned error in allowing the testimony of numerous witnesses as to Hogan's declarations, and, on all the evidence, the refusal of the court below to grant a nonsuit.

There was a verdict for plaintiffs, and from the judgment rendered, defendant assigned errors and appealed to this Court.

*Herbert McClammy, K. O. Burgwin, and E. K. Bryan for plaintiffs.*
*Rountree & Carr and George S. Jones for defendant.*

CLARKSON, J. The defendant disclaimed any responsibility of any kind for Scott's injury, and, therefore, denied any obligation for his treatment, except for first aid, which the defendant had paid. The defendant contends that no one was authorized to contract this bill on its behalf, and therefore denies liability for same.

At the close of the evidence of the plaintiffs, the defendant moved for nonsuit, and, on the denial of the motion, asked the court to charge the jury to answer the issue in favor of the defendant, contending the facts are undisputed, and insisted that the whole question was one of law. The defendant objected to all the testimony as not being made competent against it. The matters at issue, defendant contended, could be discussed under the broad questions as to whether there is any evidence in this case against the defendant, and whether a nonsuit should not have been granted at the close of the evidence.

The defendant further contends: There is no evidence of agency, other than the alleged declaration of the agent himself; that the agency cannot be proven by the declarations of the agent; that the defendant is not liable for medical treatment of an injured employee where it is not responsible for the injury, except for first aid in an immediate emergency.

We do not think the entire evidence bears out the defendant's contentions. The defendant introduced no evidence, and the plaintiffs' evidence, on a motion for nonsuit, is taken in the light most favorable to the plaintiff. It does not appear from the record whether the defendant was liable for the injury to the young man, Scott, or not, but it does appear that he was in the employ of the defendant when injured, and, by inference, about his master's business; that it was a terrible, serious and fatal injury. It appears that a local doctor was at once called to attend to Scott's injuries, and that he was lying in a tent. The

defendant paid this local doctor.  The local doctor, from the nature of the injury, found that it was necessary to send Scott to St. John's·Sanatorium in Wilmington.  This was done, and he was. taken there by two of the. employees of the defendant.  He was sent there by Hogan, who told Dr. Hoggard, when Scott was in the sanatorium, that "Cornell-Young Company was back of it; that he was in their employ, and they wanted the best attention for him; that they treated their men that way."

Now, the question, under the admitted evidence, is: Who was Hogan and what was his authority?  He was superintendent of defendant's construction works, engaged in building bridges.  He had tents for defendant's employees.  He hired and discharged the employees.  He purchased goods and materials, and the defendant sent checks from Macon, Ga., its headquarters, to pay for the purchase of goods and materials thus bought.  He was recognized as having authority to buy materials.  It was in evidence that Hogan not only superintended the construction and entire work, but often did special work for the company; that he worked on the boiler of the engine when it was broken down, etc.  Defendant, by sending checks from its home office, acknowledged that he had authority to buy material for the work, and employ and discharge the workmen used in building the bridges.  Mr. Young, of defendant company, stated that Hogan was in charge of the operation of the defendant company at that point.  The question presented to us is: Did Hogan have authority to employ plaintiffs to administer to a human employed by him when broken and fatally wounded in the work of his master, the defendant company?  If Hogan was superintendent of the construction and had entire charge, had authority to buy materials and repair and mend the broken machinery and employ and discharge the workmen, did he not have implied authority to authorize plaintiffs to care for and administer to the broken and fatally wounded employee, under the facts and circumstances of this case?

"And he said unto them, What man shall there be among you that shall have one sheep, and if it fall into a pit on the Sabbath day, will he not lay hold it and lift it out?  *How much, then, is a man better than a sheep?"*  St. Matthew, 12: 11, 12.

We think that Hogan had implied authority, under the facts and circumstances of this case, and acted within the scope of his employment in having plaintiffs care for and operate on the fatally wounded employee of defendant, and that plaintiffs were entitled to reasonable compensation for their services.  We think there was sufficient evidence *aliunde* to make Hogan's declarations competent.

In *Hunsucker v. Corbitt, ante,* 503, it was said: "Admissions by agents, made while doing acts within the scope of the agency, and

relating to the business in hand, are admissible against the principal when such admissions may be deemed a part of the res gestæ, but such admissions are not admissible to prove the agency; the agency must be shown aliunde before the agent's admission will be received." . Lockhart's Handbook on Evidence, sec. 154, citing numerous cases.

We do not think the case relied on by defendant (Adams v. R. R., 125 N. C., 565) in point. In that case the Court said: "There are some emergency instances in which the conductor may engage a physician to nurse the defendant's servants or passengers when injured, but, as to trespassers on the defendant's road, no such authority is found to exist." In that case the party injured was a trespasser; in the present case, an employee.

That case recognizes the duty of a master, when a servant is injured in his employment, to engage a physician—in emergency instances. We think there could not be a stronger emergency instance than the instant one. The local doctor thought so by sending the employee, with the authority of Hogan, the superintendent of defendant's construction works, to plaintiffs' sanatorium. Sanatorium v. Yadkin River Co., 167 N. C., 326.

We think the doctrine laid down in 14 A.—C. J., 434, correct in principle. It is said there: "A corporation is liable for hospital charges for the care of a person injured through instrumentalities used by it, where its officers and agents, with ostensible authority, direct the hospital authorities to take charge of such person and to continue the services, although no legal or moral obligation rests upon the corporation to care for him. An assistant to the general manager, with authority to look after the corporate interests in his business, has ostensible authority, in the absence of the manager, to contract in an emergency for such hospital services."

In Scott v. Monte Cristo Oil etc. Co., 15 Cal. App., p. 453, it is said: "Where the corporation defendant, though having a principal place of business at San Francisco, was engaged in developing its oil lands in Kern County, and had placed its president in supreme local authority at its works, it is held that he had presumed authority, where an employee was seriously injured thereat and became unconscious, to engage the services of a physician and surgeon, who found that he needed the operation of trephining, and to order him to be sent to a sanatorium for such operation, and to promise that the corporation would pay all bills therefor, and for nursing required thereat, and all bills required for his care at such sanatorium."

The cases seem to be conflicting in different jurisdictions; but, after a thorough and careful consideration of the decisions, pro and con, we are led to the conclusion that, under the facts and circumstances in this

case, it would have been an act of inhumanity, with the terrible injuries this young man had received in the employment of the defendant company, not to have sent him to the sanatorium for medical attention and treatment. We think the superintendent, Hogan, was in the scope of his authority and acted with good judgment and discretion. It was an emergency case and a continuing one.

We can find

No error.